LEMMON, Judge.
This litigation involves a dispute between a general contractor, H. B. “Buster” Hughes, Inc., and a subcontractor, Marsh Buggies, Inc., in connection with a pipeline construction project for Texaco, Inc. The issues are principally factual.
Prior to submitting a bid for the project contract, Harold Hughes, president of the Hughes corporation, obtained a letter bid from Marsh Buggies to dig approximately 52,000 feet of pipeline ditch and to backfill the ditch with four feet of cover (after the pipe was laid by Hughes) for a price of $1.36 per lineal foot. When Texaco awarded Hughes the contract on July 26, 1971, he immediately notified Marsh Buggies that he accepted its bid and that the pipeline had to be ready for operation on September 1, 1971. (Wilton Autin, Marsh Buggies’ president, insists he immediately informed Hughes the deadline could not be met, but undertook the subcontract when Hughes advised he would obtain an extension.)
The pipeline route included approximately 7i/¿ miles of marsh land and 2^ miles of drained lands surrounded by levees. The work under the subcontract required the use of marsh buggy draglines in the marsh and tractor cranes in the drained lands.
Hughes planned to start the pipe laying in the marsh area by barge and in order to get a head start moved two of his own marsh buggies into the area to begin digging the ditch ahead of the lay barge. Au-tin moved one marsh buggy into the work area on August 1 and another on August 4.
In the meantime Texaco had expressed dissátisfaction with the rate of progress, and Hughes rented two more marsh buggies, which also arrived on the job on August 4. Autin called Hughes that evening to inquire as to the purpose of the new equipment, and the versions of that telephone conversation raise the principal factual disputes in the case.
Hughes’ version was: Autin on July 27 had promised him five marsh buggies immediately in order to meet the deadline, but had only one on the job by August 3, so he rented the extra buggies, intending to use them only until Autin’s five buggies began working. He and Autin agreed that he would pay Autin the full contract price, but Autin would owe him some “hour for hour” repayment on a future job.[1]
Autin’s version was: His bid did not specify time for performance or the num *365 ber of pieces of equipment to be used. He only owned three marsh buggies and promised these (and two tractor cranes for the drained lands). The buggies had to be taken off other jobs after proper arrangements and were placed in the marsh as soon as possible. When the rented equipment appeared on the job, he objected, insisting on digging the entire footage, since his $1.36 per foot bid represented an estimated cost of digging in the marsh at $0.-75 per foot and digging in the drained lands at $2.57 per foot.[2] He agreed to permit rented equipment to do some of the digging in the marsh only after Hughes promised to set off the cost of the rented equipment against an unexpected additional cost Autin was incurring because deeper digging was required in the drained lands.[3]
Thus, the parties agreed that they modified the original contract for Autin to dig and backfill the entire ditch for $1.36 per foot, but disagreed on the terms of the modification. The trial judge observed that each party had been lax in clearly communicating his intention as to the modification, although he stated that Hughes’ version of swapping time was the more reasonable. He ruled, however, that under either version each party had intended Au-tin to receive the full contract price and that Autin had substantially performed under the vague terms of the modified agreement.
We disagree with the reasoning on two bases. First, the record does not support a finding that Marsh Buggies substantially performed under the modified contract so as to be entitled to the full contract price. To recover the full amount sought, Marsh Buggies had the burden of proving the terms of the modified contract as to price. The record indicates the parties agreed that rented equipment would dig some of the ditch in the marsh, but there was never a meeting of the minds as to the price Marsh Buggies would receive for digging the remainder of the ditch. Since Marsh Buggies failed to prove a specific contract price, the law presumes the parties intended a reasonable price, and recovery must be based on a reasonable value for the work performed.[4]
Second, irrespective of the intent of the parties in modifying the contract, the fact remains that other parties did perform some of the work Marsh Buggies was obliged to do under the original agreement. Under these circumstances it is improper to allow Marsh Buggies full recovery for this work (while Hughes also paid others for part of the same work), since this would allow Marsh Buggies to enrich itself at the expense of another. See C.C. art. 1965.
We therefore believe the proper approach is to set an award based on the evidence of the amount and value of contract work performed by Marsh Buggies.[5]
Both parties agree that Marsh Buggies performed all of the work in the drained lands. The simplest way to calculate the amount due to Marsh Buggies for the whole project would be to subtract the *366 footage in the swamp dug by others and to apply the price per foot used by Marsh Buggies in preparing the bid.[6] Although the evidence is not at all clear on this point, we attempt to analyze the evidence to determine the issue of the amount of work performed by Marsh Buggies in the marsh area.

Digging

Hughes introduced a color-coded exhibit which conceded to Marsh Buggies approximately 14,500 feet of the total of approximately 37,000 feet dug in the marsh. On the other hand, Marsh Buggies’ field foreman conceded some areas of digging by others. The dispute was thus narrowed to two main segments, approximately 16,500 feet in total length. To resolve this dispute, we have examined daily time reports filed by the operators of the rented buggies, many of which indicated their location at the beginning and end of the day’s work by reference to survey station numbers.
It is undisputed that the first 3,586 feet was dug by Hughes’ owned or rented equipment, that the next 2,411 feet was dug by Marsh Buggies, and that the 900-foot crossing of Bayou Dupre was not covered by the contract.'[7]
The first major area of dispute is the next 8,943 feet (between stations 68 + 97 and 158 + 40). Daily reports on the rented equipment show that D-38 dug approximately 1,500 feet between these points, including two crossings which required additional depth, that D-39 dug 1,600 feet, and that D-41 dug at least 1,700 feet (plus at least four days in that time frame when the location was not indicated).
Hughes claimed digging in the vicinity of station 172, but the records establish nothing of value. However, D-39 did dig 1.300 feet beginning at station 184 -I- 00. Areas of other minor disputes were near stations 247 (involving redigging), 285, and 292, but records establish only 400 feet of digging by rented equipment in this area.
In the final major area of dispute between stations 298 and 385, records show 2.300 feet of digging by, D-38 during a ten-day period in which the operators of D-39 indicated digging an estimated 2,170 feet but did not record the location.
Hughes’ records indicate that while its owned equipment did some ditch digging at unspecified locations, these buggies were used principally for other work unrelated to the Hughes-Marsh Buggies subcontract.
We conclude Hughes has proved its owned or rented equipment dug approximately 14,000 feet of ditch and one crossing in the marsh which were originally scheduled to be dug by Marsh Buggies.

Backfilling

The daily records for the rented equipment contain no location information during the days spent in backfilling. However, the four rented machines (a fourth moved onto the job on August 21) spent a composite total of at least 27 days on this phase of the project and incomplete records of one machine indicate an estimated 8.300 feet of backfilling.
On the other hand, Marsh Buggies used only two machines in the backfilling operations, and the records indicated a composite total of 32 days spent on this phase.
We conclude Hughes proved its owned or rented buggies backfilled at least as *367 much footage as they originally dug in the swamp.

Award Under Contract

Marsh Buggies’ total bill was $69,663.28 (51,223 feet of ditch at $1.36). Since Marsh Buggies estimated a cost of $0.75 per foot (plus 10%) for work in the swamp, we reduce the bill by $11,550.00 (14,000 feet at $0.75 per foot, plus 10%).[8] The price of crossing No. 3 (conceded as being dug by rented buggies) appears to have been estimated on the basis of three 12-hour days at $35.00 per hour, plus 10%, or $1,386.00. Accordingly, the total award due to Marsh Buggies, Inc. under the contract is set at $56,727.28 ($69,663.28 minus $11,550.00 minus $1,386.00).

Extra Work in Drained Lands

Marsh Buggies bid the original contract on the basis of a ditch with four feet of cover throughout, which would require a six to seven-foot ditch, when allowances are made for the size of the pipe and for sloughing. To recover additional compensation, the burden was on Marsh Buggies to show digging to a greater depth in the drained lands.
Autin and his foreman contend that in order to get three feet of water in the ditch in the area of drained lands, they had to dig to 16 feet near a highway close to the end of the project and to nine feet near the levee which separated the drained lands from the marsh area. Hughes denied that he authorized such digging or that it was necessary in order to have water at the bottom of the ditch.
Texaco’s chief inspector, who was on the job site continuously, testified that such excessive depths were not dug and indeed would have required special permission from his superiors; that there was only a 12-inch difference in elevation between the highway and the back levee; that the water level was near the top of the ditch throughout the drained lands; and that his crew measured the ditch depth throughout before the pipe was laid.
The as-built drawings indicated that the top of the pipe was probed in the drained lands after completion at five to seven feet, with an occasionally deeper measurement. Autin explained that after the pipe was floated, dirt was placed back into the ditch under the pipe to support it at the proper level. The inspector, however, testified he was present when the pipe was placed in the ditch and that no such procedure was used.
To obtain additional evidence on this dispute, Marsh Buggies moved during trial to have digging tests made in the area. In the testing three holes dug in different locations between the highway and the back levee produced no water at 12 feet of depth.
We consider these tests inconclusive. Separate holes dug and immediately covered hardly represent the water condition in a continuous ditch after several weeks of rainy weather. Furthermore, the engineering report of the tests indicated the land did not change significantly in elevation across the entire area tested, which tends to contradict the testimony of Autin’s foreman.
We conclude Marsh Buggies failed to prove entitlement to additional compensation for digging in the drained lands to depths in excess of contract specifications.

Cost of Divers

In its reconventional demand the Hughes corporation claimed it had to hire divers to bury the pipe in areas where Marsh Buggies had improperly dug the ditch. The trial judge subtracted the cost of these divers from the award to Marsh Buggies.
*368 Hughes’ job superintendent admitted that divers were normally used in laying pipe in pipeline canals in marshy areas. The burden was thus on Hughes to prove that Marsh Buggies’ improper work caused the necessity for additional expenditures for divers.
Hughes’ principal complaint was that three crossings in the drained lands had to be “jetted” by divers.[9] However, Hughes made no effort to distinguish between the billings for diving work normally required by the general contractor and those for extraordinary work allegedly required by Marsh Buggies’ inferior performance. Neither did Hughes produce any divers or representatives of the diving company to verify the claim that additional or unusual work was required. Furthermore, Autin asserted that if any unusual amount of “jetting” by divers was required in the drained lands, it was because Hughes left the ditch open too long in rainy weather.
We conclude Hughes simply failed to prove that any extraordinary use of divers was necessitated by Marsh Buggies’ improper digging and therefore was an item of cost which should not be borne by the general contractor.

Damages for Frivolous Appeal

Marsh Buggies contends that since Hughes stipulated as to the correctness of charges of $18,143.83 for extra work, Hughes’ appeal as to this amount was frivolous.
Marsh Buggies’ demands totaled more than $87,000.00, and Hughes had paid $20,000.00 in partial payment. In addition Hughes’ reconventional demand exceeded $73,000.00. Under these circumstances we cannot say any part of Hughes’ appeal was frivolous.

Decree

For these reasons the judgment of the trial court against all three defendants under the subcontract and lien claim is amended and reduced to $36,733.78.[10] The judgment against H. B. “Buster” Hughes, Inc. only, in the amount of $18,143.83, is affirmed. In all other respects, the judgment is affirmed. The total costs in both courts are to be equally divided between plaintiff and defendants.
Amended and affirmed.

. When Autin’s third and last buggy did not arrive until August 10, Hughes rented a third buggy (on August 8) and kept his two buggies and the three rented buggies on the job until the line became operational, but still did not meet the operational deadline. He was not assessed a penalty, however, because Texaco’s customer was not ready on schedule to receive the product to be shipped by pipeline.

. Other testimony established that digging in the drained lands was approximately three times as costly as digging in the marsh.

. Autin claimed that when the tractor cranes began digging in the drained lands and the bottom of the ditch was dry at the contemplated depth, Hughes instructed him to dig deep enough to get 2% to 3 feet of water in the ditches. This amount of water was necessary to float the pipe, which was a considerably less expensive method of construction than land-laying pipe.

. Marsh Buggies’ petition can be interpreted as seeking alternative recovery on this basis, and voluminous evidence on the value and extent of Marsh Buggies’ work was introduced without objection. In fact, Marsh Buggies’ first bill was based on the amount of contract work calculated at an hourly rate, and Hughes introduced evidence to show the extent of work done by others.

. Marsh Buggies’ equipment was also used in extracontract work, and its bill in the amount of $18,143.83 for this additional work is not disputed.

. A complicating factor is that Hughes’ owned and rented buggies were utilized not only for digging and backfilling work under Marsh Buggies’ subcontract, but also for work under the general contract, such as assisting the lay barge and tieing in sections of the line. Thus, it would not be fair to simply deduct the total amount Hughes paid for the rented equipment.

. These figures represent the distance between station markers indicated on Texaco’s survey.

. Counsel for Marsh Buggies concedes' in brief that credit, if any is due, should be calculated on this basis.

. Hughes also testified as to one specific location, in the marsh where the crossing was not dug deep enough and had to be re-dug and then “jetted” by divers. This crossing, however, was shown on the daily time reports as dug by rented equipment, and proper credit has thus already been allowed.

. This amount includes $6.50 for filing and recording the lien.